UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

ERVIN R. HALL-BEY,                       )
                                         )
                  Plaintiff,             )
      vs.                                )    2:04-cv-69-RLY-WGH
                                         )
EVELYN RIDLEY-TURNER, et al.,            )
                                         )
                  Defendants.            )

**Entry Discussing Motions for Summary Judgment**

For the reasons explained in this Entry, the defendants' motions for summary judgment must be **granted.**

**I. Background**

The plaintiff in this civil rights action is Ervin Hall-Bey ("Hall-Bey"), who at all relevant times was confined at the Wabash Valley Correctional Facility ("WVCF"). He filed this action on March 29, 2004. The defendants are Commissioner of the Indiana Department of Correction ("DOC") Evelyn Ridley-Turner, DOC Medical Director Dr. Dean Rieger, Medical Administrator Joe Thomas, Dr. Anwer Jaffri, Unit Team Manager Dick Brown, Assistant Superintendent John Mulroony, and Assistant Superintendent David Bonner. Hall-Bey alleges that the defendants were deliberately indifferent to his serious medical needs. He seeks compensatory and punitive damages and injunctive relief. The defendants seek resolution of Hall-Bey's claims through the entry of summary judgment. Defendants Ridley-Turner, Rieger, Brown, Mulroony and Bonner filed a motion for summary judgment on September 26, 2005, and defendants Thomas and Jaffri filed a motion for summary judgment on October 28, 2005.[1]

---

[1] "Summary judgment is appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Westra v. Credit Control of Pinellas,* 409 F.3d 825, 827 (7th Cir. 2005) (quoting Rule 56(c) of the *Federal Rules of Civil Procedure*). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.* "'It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'" *Sanders v. Village of Dixmoor,* 178 F.3d 869, 870 (7th Cir. 1999) (quoting *Liberles v. County of Cook,* 709 F.2d 1122, 1126 (7th Cir. 1983)).

## II.  Undisputed Facts

On the basis of the pleadings and the expanded record, and specifically on the portions of that record which comply with the requirements of Rule 56(e), the following facts are undisputed for purposes of the motions for summary judgment:

Hall-Bey was transferred to the WVCF on May 8, 2001. Hall-Bey is an insulin-dependent diabetic. In November 2001, Hall-Bey wrote Unit Manager Dick Brown, telling him that a sick call doctor had denied his request to approve a soft sole gym shoe unless it was approved by Mr. Brown. Hall-Bey sought Mr. Brown's approval for outside shoes. Mr. Brown responded on December 3, 2001, by stating that "if medical approves for these shoes, I have no problem with approving them. Please let me know if they get approved."

On December 24, 2001, Hall-Bey submitted a Health Care Request Form ("HCRF"). He alleged a torn tendon in his right foot just below the large toe. He claimed his foot was swollen and sore.

On December 29, 2001, Hall-Bey was seen twice in sick call for blood sugar checks. On January 10, 2002, Dr. Jaffri reviewed Hall-Bey's medical packet. He issued no new orders. On February 2, 2002, Hall-Bey failed to appear for his flu vaccination. Custody informed the medical unit that he had chosen to go to recreation instead. Later that day, Hall-Bey was seen in the Chronic Care Clinic for hypertension and diabetes. He voiced no complaints.

On February 14, 2002, Hall-Bey appeared for a blood sugar check. His blood sugar was recorded at 451. Dr. George was paged and he ordered additional insulin be administered. Hall-Bey made no further complaints. On February 15, 2002, Hall-Bey was seen in sick call by Dr. Jaffri for a follow-up blood sugar check. Hall-Bey's blood sugar was noted at 210. Hall-Bey had no complaints and he was scheduled for a follow-up visit.

On February 20, 2002, Dr. Jaffri reviewed Hall-Bey's blood sugar results from the previous five days. He adjusted Hall-Bey's insulin intake. On March 15, 2002, Hall-Bey was examined by Dr. Jaffri. Hall-Bey was advised to be more compliant with his blood sugar checks. Dr. Jaffri adjusted Hall-Bey's insulin intake again. Dr. Jaffri scheduled him for follow-up in fifteen days. Dr. Jaffri also noted in his order that Hall-Bey "may have shoes from outside (aproved [sic] by D. Brown)".

On March 20, 2002, Hall-Bey submitted a HCRF. He alleged his calves had been cramping for the last three days. The nurse noted that he had just seen the physician on March 15, 2002. That same day a physician reviewed his packet, but issued no new orders.

On April 14, 2002, Hall-Bey submitted a HCRF. He complained of a torn ligament in his left foot, which he aggravated playing basketball. On April 16, 2002, Hall-Bey was seen in nursing sick call. He complained of a knot on the sole of his left foot. A nurse noted that Hall-Bey had medical approval for shoes from outside. Hall-Bey was instructed to see his counselor for outside shoes.

In April 2002, Hall-Bey ordered and paid for gym shoes from an outside vendor. The mail room contacted Dick Brown when the shoes arrived at the facility. One of Dick Brown's responsibilities as a Unit Team Manager at WVCF was to review issues concerning offender property when items were seized by the mail room. Brown contacted the Medical Department and was informed that there was no medical order for those shoes. Dick Brown did not approve the shoes. On April 5, 2002, Brown wrote on the Notice and Report of Action Taken on Correspondence form "Denied. No medical order for the shoes." On April 22, 2002, in response to Hall-Bey's HCRF complaining that his shoes were being held by the mail room, a nurse responded that "your shoes will be picked up today and you will be called over."  The shoes were not picked up by medical.

On April 29, 2002, Hall-Bey received arch cushions for his shoes. On May 2, 2002, Hall-Bey filed a HCRF complaining about a sore foot. He was scheduled for nursing sick call. On May 10, 2002, Hall-Bey submitted a HCRF. He complained that a knot on his left foot had gotten bigger and that it was difficult to walk. Hall-Bey stated that his arch supports did not fit his "state boots." He wanted his "medically approved shoes" which were being held by custody in the mail room. Hall-Bey was scheduled for sick call on March 13, 2002.

On May 12, 2002, Hall-Bey submitted another HCRF. The nurse noted that he was already scheduled for sick call for evaluation of his left foot. On May 13, 2002, Hall-Bey was seen in nursing sick call. Hall-Bey complained of a possible ligament injury. He claimed he could feel a small round mass in the arch of his foot when his toes were flexed. Hall-Bey complained of pain when the mass was palpated. The nurse noted that Hall-Bey was flatfooted and that he complained of trouble getting ordered shoes. Hall-Bey had an order for arch supports. Hall-Bey was given arch supports that fit his current pair of boots. Hall-Bey's chart was scheduled for physician review.

On May 15, 2002, Hall-Bey filed a HCRF. He complained that he had not received his shoes ordered from an outside vendor. He asked that Dr. Desonia examine him. He was scheduled for sick call. On May 16, 2002, Hall-Bey was seen in sick call by a nurse and Dr. Desonia. He complained of left foot pain. He stated he had shoes "up front" that were being held by custody, and a physician must order their release. A nurse discussed Hall-Bey's concerns with the Director of Nursing. Hall-Bey was informed that his Unit Team Counselor Dick Brown had refused to authorize his shoes as they were against the security policy. The nurse stated that Dr. Jaffri's order for shoes was dependent on Mr. Brown's approval. The nurse attempted to give Hall-Bey new arch supports, but he told her they did not help. Hall-Bey alleged that Mr. Brown had not refused the shoes and became argumentative. Dr. Desonia requested that custody return Hall-Bey to his cell.

On May 23, 2002, Hall-Bey submitted a HCRF and alleged that he had a blister on his right foot. He was seen in nursing sick call that afternoon. The nurse noted that Hall-Bey had an approximately two centimeter (2cm) area on a toe that was pale red. There was no sign of infection present. Hall-Bey was given a band-aid and instructed to keep the area clean. He was instructed to contact the medical unit at the first sign of infection. Hall-Bey voiced his understanding and made no further complaints.

On May 29, 2002, Hall-Bey submitted a HCRF to then Health Care Administrator Gene Buck (since deceased). Hall-Bey alleged that Dr. Jaffri approved him for outside shoes and that they were being held by custody because there was no medical order. Hall-Bey alleged that Dr. Jaffri had given an order. The nurse responded that Dr. Jaffri's order was contingent on Dick Brown's approval and Mr. Brown had not approved the shoes. On June 1, 2002, Hall-Bey signed the Disposition of Offender Personal/Property Correspondence. He asked that the shoes detained by custody be forwarded to Attorney Jerry Jarrett. The shoes were mailed to Mr. Jarrett.

On June 5, 2002, Hall-Bey submitted a HCRF. He complained of foot pain. On June 7, 2002, Dr. Jaffri examined Hall-Bey's foot in sick call. Dr. Jaffri noted a possible blister on the plantar surface of Hall-Bey's left foot. Dr. Jaffri believed it was caused by tinea pedis bacteria and prescribed antifungal cream and antibiotics.

Hall-Bey submitted a HCRF on June 25, 2002. He wanted to remind Dr. Desonia of his torn ligament, blisters on his feet, and his need for shoes. Hall-Bey was seen in sick call. He complained that he had run out of cream for his feet and that itching and peeling continued. Dr. Desonia examined Hall-Bey. He noted some slight erythema, but no open sores were present. He renewed Hall-Bey's prescription for foot cream and advised him to mix the prescription cream with antifungal cream available on the commissary. Hall-Bey was also advised to start wearing orthotics. Finally, Hall-Bey was scheduled for lab work-up.

On June 26, 2002, Hall-Bey had blood drawn for lab work-up. He voiced no complaints. On June 30, 2002, Hall-Bey submitted a HCRF. He alleged that he had open sores between the toes of his right foot. He also complained that his left foot tendon hurt so bad that he couldn't walk to get insulin.

On July 6, 2002, Hall-Bey appeared in sick call for a blood sugar check. He complained of foot pain. The nurse inspected his right foot. She noted a small open area on his right foot. Hall-Bey alleged he observed spots of blood in his cell. The nurse advised him to keep the area clean and dry. Hall-Bey was referred to the physician. On July 8, 2002, Hall-Bey appeared in sick call for insulin. He refused his insulin and stated, "I know myself to know if I take that insulin, I'll be in trouble." Hall-Bey was escorted back to his cell.

On July 9, 2002, Hall-Bey was examined by Dr. Jaffri. Hall-Bey told Dr. Jaffri he was in a depressed mood because of the sores on his feet. Dr. Jaffri examined Hall-Bey's feet. No ulcerations or sores were present. Dr. Jaffri diagnosed a tinea pedis fungal infection (athletes foot) and onycomyosis. Hall-Bey's insulin was adjusted and he was scheduled for blood sugar checks in the morning and evening. On July 16, 2002, a nurse wrote a note confirming that Dr. Jaffri had written a note on March 15, 2002, stating that Hall-Bey "may have shoes from outside, approved by D. Brown."

On July 26, July 27, July 31, and August 1, 2002, Hall-Bey refused his insulin and blood sugar check. Later on August 1, 2002, Hall-Bey was seen in nursing sick call for complaints of a knot on the bottom of his left foot. A nurse examined him and noted an approximately one half inch raised area under the skin on the bottom of Hall-Bey's left foot.

4

The lump was movable with palpation. Hall-Bey stated it was painful to walk and that the lump had grown in size. He was referred to a physician.

On August 5, 2002, Hall-Bey was examined by Dr. Elaine Ristinen. She noted that Hall-Bey alleged pain and that the "stasis" was growing. Dr. Ristinen discovered an approximately one centimeter (1cm) palpable nodule on the plantar aspect of the left foot. The mass was not able to be seen with the naked eye. She advised Hall-Bey that this was probably a plantar fibromatosis. She reassured Hall-Bey and advised him to try topical creams or to soak his foot two to three times per day. Hall-Bey was scheduled for follow-up.

On August 9, August 10, and August 17, 2002, Hall-Bey refused his insulin and blood sugar check.

On September 9, 2002, Hall-Bey was examined by Dr. Patsamatla. Hall-Bey complained of a knot on his left foot. He was prescribed antibiotics and codeine for pain.

In September 2002, Hall-Bey ordered a second pair of Nike gym shoes. The shoes were disallowed. On a Notice and Report of Action Taken form relating to the confiscation of the Nike shoes after they had been delivered to the prison, Joe Thomas wrote that the shoes had been "denied by medical." After the grievance process was completed and the denial of the shoes was upheld, the shoes were destroyed on June 5, 2003.

On October 9, 2002, Hall-Bey submitted a HCRF. He complained of foot pain. On October 10, 2002, Hall-Bey was seen by a nurse. He voiced no complaints. Later on October 10, 2002, Hall-Bey notified his unit counselor that he wished to file a grievance over the second pair of shoes detained by custody. He filed a grievance and the response indicated that Assistant Superintendent Bonner had denied the shoes, and that "if medical sees a need for special shoes, medical must purchase."

On October 15, 2002, Hall-Bey was seen in nursing sick call. A nurse noted that he walked with a steady gait, had good capillary refill in his extremities and no edema was noted. He did have slightly raised blood pressure. Later, Hall-Bey had his blood pressure rechecked.

On October 17, 2002, Hall-Bey refused to come to sick call. A nurse examined him at his cell door. He complained of back pain, but that he believed his blood pressure was normal. The nurse advised him of the importance of monitoring his blood pressure. Hall-Bey verbalized his understanding and had no further complaints.

On October 20, 2002, Hall-Bey refused to come to sick call for a blood pressure check. Later in the day, Hall-Bey appeared in the infirmary to check his blood pressure. The nurse noted that he denied headaches or dizziness. Hall-Bey made no complaints. On October 21, 2002, Hall-Bey was examined by Dr. Vernon. Dr. Vernon observed some swelling in the plantar area of Hall-Bey's left foot. There was no sign of infection and Hall-Bey's pedal pulses were within normal limits. Dr. Vernon informed Hall-Bey that he would be referred to a podiatrist if approval was granted. Hall-Bey was scheduled for follow-up.

On October 24, 2002, Hall-Bey was brought to the infirmary for a blood pressure check. He voiced no complaints. On October 26, 2002, Hall-Bey refused to come to sick call for a blood pressure check. The nursing staff notified Dr. Marandet, who issued new orders.

On November 8, 2002, Hall-Bey underwent a quarterly psychiatric evaluation. No new orders were issued. That same day, Hall-Bey was examined by Dr. Jaffri. He noted a fatty growth of approximately one half of a centimeter under the plantar surface of the left foot. Hall-Bey experienced mild tenderness on deep palpation. Dr. Jaffri planned to watch the growth. Based upon Hall-Bey's current condition, Dr. Jaffri did not feel a referral to a podiatrist was warranted. On November 11, 2002, Hall-Bey received insoles.

On December 21, 2002, Hall-Bey was seen in sick call for an insulin injection. He complained of pain under his right rib cage. The nurse noted no red or bruised areas, but there was a five centimeter area that was swollen and tender. Hall-Bey denied blood in his stool. Bowel sounds were present and normal. The abdomen was non-tender. Dr. Jaffri examined Hall-Bey. He diagnosed a musculoskeletal pull and prescribed pain medication. Hall-Bey also had his insulin adjusted.

On January 9, 2003, Hall-Bey appeared for his annual health screen. On January 19, 2003, Hall-Bey appeared in nursing sick call. He had blood drawn. Hall-Bey voiced no complaints. On January 20, 2003, Dr. Jaffri reviewed Hall-Bey's preliminary lab results. On January 22, 2003, Dr. Jaffri reviewed Hall-Bey's finalized lab results. No new orders were issued.

On February 5, 2003, Hall-Bey submitted a HCRF. He complained of numbness and achiness in his lower legs and feet. He also complained about high blood sugar. On February 6, 2003, Hall-Bey was triaged in nursing sick call. Hall-Bey complained of numbness and pain in his legs. The nurse noted no signs of edema. On February 10, 2003, Hall-Bey was seen in sick call and examined by a physician. The physician noted Hall-Bey had suffered from diabetes for over six years, with elevated blood sugars over the past two weeks. The physician performed a physical exam. Hall-Bey had good pulses at all extremities. His color was good. The physician noted that Hall-Bey's blood sugar had been just over 300 at dinner the evening before. Hall-Bey's insulin intake was adjusted and he was scheduled for follow-up.

On February 15, 2003, Hall-Bey underwent a quarterly psychiatric workup. On February 27, 2003, Hall-Bey submitted a HCRF. He complained of elevated blood sugar, calf muscle aches, and cramping. The nurse instructed Hall-Bey to appear three to four times daily for blood sugar checks so the medical staff could get an accurate picture of his blood sugar management.

On March 4, 2003, Hall-Bey submitted a HCRF. He complained of a lump under his left foot that he alleged was red and swollen. He stated he was willing to have blood sugar checks done.

On March 7, 2003, Hall-Bey was seen in sick call and examined by a nurse. She noted a nickle sized, raised, hard, and non-moveable area just below the great toe. The mass was very tender to touch. Hall-Bey alleged the area was getting larger and more tender all the time. On March 10, 2003, Hall-Bey was examined by Dr. Jaffri. He noted Hall-Bey complained of foot swelling. Dr. Jaffri observed an approximately one centimeter (1cm) soft swollen nodule on the plantar surface on Hall-Bey's foot. Hall-Bey complained that he walked in pain. Dr. Jaffri believed the mass to be a lipoma. He noted the mass was soft. Dr. Jaffri did not believe that it could cause pain. Despite this belief, Dr. Jaffri prescribed Naprosyn for fifteen days. He also instructed Hall-Bey to wear tennis shoes.

On March 21, 2003, Hall-Bey submitted a HCRF. He alleged he needed a copy of the medical order of March 10, 2003, so that the shoes he had purchased from an outside vendor could be brought into the prison. Dr. Jaffri reviewed his request. He responded that tennis shoes which met Hall-Bey's medical needs were available on the commissary and that the shoes being held by custody did not meet security protocol.

On April 1, 2003, Hall-Bey was seen in sick call and examined by Dr. Jaffri. Hall-Bey still complained of a soft swollen mass on the plantar surface of his left foot. He complained of pain. Dr. Jaffri noted the mass was over the ligament and made a request for a podiatric referral.

On May 16, 2003, Hall-Bey was examined by a podiatrist at Wishard Hospital. The physician diagnosed plantar fibromatosis and recommended insoles for Hall-Bey's work boots and non-weightbearing exercises. The physician also noted that it was "okay to pick up outside tennis shoes." Dr. Jaffri reviewed the podiatrist's recommendations and ordered insoles for Hall-Bey. On May 21, 2003, Hall-Bey refused the insoles.

On June 4, 2003, Dr. Jaffri reviewed Hall-Bey's packet after Hall-Bey refused insoles on May 21, 2003. He noted that Hall-Bey was non-compliant with recommended treatment. Hall-Bey was scheduled for sick call to discuss his noncompliance. On July 9, 2003, Hall-Bey was seen in the Chronic Care Clinic. A nurse recorded new orders.

On August 3, 2003, Hall-Bey submitted a HCRF. He complained of swollen lymph nodes and aches in his right big toe. He was scheduled for nursing sick call. On August 4, 2003, Hall-Bey was seen in sick call and examined by a nurse. She noted a large lymph node gland below his chin near the left side of the throat. His condition was reported to the physician. Hall-Bey reported he was engaged in a basketball game and his left nostril had been scratched. Later he observed tan drainage from the wound. On August 13, 2003, Hall-Bey was seen in sick call by Dr. Jaffri. He noted the alleged knot under Hall-Bey's chin was gone. Dr. Jaffri further noted that Hall-Bey admitted to him that he had been playing basketball recently. Dr. Jaffri again reminded Hall-Bey about the importance of taking insulin. Hall-Bey verbalized his understanding.

On September 21, 2003, Hall-Bey submitted a HCRF. He asked if there was an order in his packet approving outside tennis shoes. A nurse advised him there was no such order in his packet.

On October 5, 2003, Hall-Bey was seen in sick call. A nurse noted a small open area on the fifth digit of his right foot. Hall-Bey also complained of swelling in his ankles. He was referred to a physician.

On December 31, 2003, Hall-Bey had labs drawn. On January 7, 2004, Hall-Bey appeared for his annual health screen. He complained of left foot pain.

On January 26, 2004, Hal-Bey was seen in nursing sick call for complaints of left shoulder pain. He alleged pain for the past week. The nurse noted that he walked with a steady gait and was oriented to person, place, and time. Hall-Bey was scheduled for follow-up with a physician. Later that day, Hall-Bey submitted a HCRF. He complained of headaches and shoulder pain. A nurse scheduled him for sick call. On January 27, 2004, in sick call Hall-Bey complained of back pain which extended down his left side into his leg. He walked with a slow steady gait. The nurse referred him to a physician and advised him to rest and take pain relievers available at the commissary.

On February 3, 2004, Hall-Bey refused insulin. He stated he would make it up on the next shift. That same day, a physician reviewed Hall-Bey's medical packet and increased his insulin intake.

On February 6, 2004, Hall-Bey submitted a HCRF. He reported the insulin increase of February 3, 2004, was incompatible with his food intake and availability. On February 9, 2004, Dr. Jaffri reviewed Hall-Bey's request and adjusted his insulin. On February 11, 2004, Hall-Bey received a nutritional consult. She noted that he was a diabetic and his previous diet card had expired. Hall-Bey was placed on a 2,000 calorie ADA diet.

On February 24, 2004, Hall-Bey was examined by Dr. Jaffri. He noted that Hall-Bey complained of back pain and left shoulder pain. Dr. Jaffri diagnosed musculoskeletal pain and prescribed pain medication. Hall-Bey was scheduled for follow-up.

On February 29, 2004, Hall-Bey submitted a HCRF. He complained about the lump on his left foot. Later that day, Hall-Bey was seen in sick call and examined by a nurse. The nurse noted a lump was "a quarter size." The lump appeared tender. Hall-Bey was referred to a physician. On March 5, 2004, Hall-Bey appeared for a blood sugar check. His blood sugar was 59. The nurse noted that his skin was cold, but that he walked with a steady gait. Hall-Bey received crackers and dinner in the infirmary. He refused insulin after dinner.

Prison and DOC policies provide that an offender may have one pair of gym shoes which are to be purchased only through the commissary. The commissary offers New Balance cross trainers and basketball shoes. Hall-Bey disputes whether these particular shoes were available through commissary at the time of his requests.

Ordering tennis shoes from outside vendors raises a number of security issues, including concerns that it would be possible to hide contraband in the shoes and allow opportunities for trafficking. In addition, unique tennis shoes would be valuable within the prison and could make them targets for theft and trading for prohibited reasons, such as paying debts or trading for contraband.

In relation to Hall-Bey's claims, the only involvement by Commissioner Ridley-Turner was in referring complaints received by her department to the department's medical director. The only involvement by Dr. Rieger in relation to Hall-Bey's claims was to respond to letters sent to the DOC. There was no involvement by Assistant Superintendent Mulrooney except to respond to grievances.

### III. Conclusions of Law

The Eighth Amendment's proscription against the imposition of cruel and unusual punishment provides the constitutional standard for the treatment of convicted offenders such as Hall-Bey. *Helling v. McKinney,* 509 U.S. 25, 31-32 (1993). The Eighth Amendment's proscription against cruel and unusual punishment protects prisoners from the "unnecessary and wanton infliction of pain" by the state. *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (citation and internal quotations omitted). Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement by ensuring that inmates receive adequate food, clothing, shelter, and medical care, and by taking reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994).

> A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component. To satisfy the objective component, a prisoner must demonstrate that his medical condition is "objectively, sufficiently serious." A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a "sufficiently culpable state of mind." The officials must know of and disregard an excessive risk to inmate health; indeed they must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." This is not to say that a prisoner must establish that officials intended or desired the harm that transpired. Instead, it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk. Additionally, a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005) (some quotations and internal citations omitted).

A court examines the totality of an inmate's medical care when determining whether defendants have been deliberately indifferent to an inmate's serious medical needs. *Reed v. McBride,* 178 F.3d 849, 855 (7th Cir. 1999). It is well-settled that while incarcerated, an inmate is not entitled to the best possible care or to receive particular treatment of his choice. *See Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir. 1997). Negligence, even gross negligence, is insufficient to establish deliberate indifference under the Eighth Amendment. *See Farmer,* 511 U.S. at 835; *Mathis v. Fairman,* 120 F.3d 88, 92 (7th Cir. 1997); *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). Hall-Bey is "entitled to reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267.

Hall-Bey is a diabetic who had a tender lump on the bottom of his left foot. For purposes of the defendants' motions, Hall-Bey's diabetes and foot conditions are considered serious medical needs. Hall-Bey alleges that the denial of tennis shoes ordered from an outside vendor constituted deliberate indifference to his serious medical needs. In April of 2002, Unit Manager Dick Brown denied Hall-Bey's request for tennis shoes purchased from outside the prison because Brown had been informed by the medical staff that the shoes had not been approved. It appears that this was an error, as Dr. Jaffri had written an order on March 15, 2002, stating that Hall-Bey could have shoes from the outside. A second pair of shoes was apparently denied in September 2002 for the same reason, the lack of a medical order. Defendant Medical Administrator Joe Thomas was told by medical staff that the shoes were not medically approved. Defendant Assistant Superintendent Bonner indicated in response to a grievance that the shoes were not approved, and that if "medical" wanted Hall-Bey to have a particular pair of Nike shoes, "medical" would have to pay for them. There is also evidence that the shoes were denied for security reasons. Reasonable security issues such as delivering contraband and prohibited trading or theft were implicated if more stylish tennis shoes were allowed to be delivered to a prisoner from outside the prison. The record is conflicting, therefore, as to whether the problem was a lack of medical approval or whether custody staff ultimately denied the shoes for other security and policy reasons. There is no evidence, however, that the denial of the tennis shoes purchased outside the facility was based on deliberate indifference to a serious medical condition. Rather, it was the result of miscommunication or at worst, negligence, or because of policy restrictions. Accordingly, Dick Brown, Joe Thomas, and Assistant Superintendent Bonner are entitled to summary judgment.

Dr. Jaffri did not refuse to treat or ignore Hall-Bey's foot problems. When he learned that Hall-Bey had not received the shoes ordered from an outside source, Dr. Jaffri provided other methods of treating the foot condition. Dr. Jaffri informed Hall-Bey that the shoes available from the commissary met his medical needs and he advised Hall-Bey to purchase tennis shoes from the commissary. Dr. Jaffri also provided insoles, prescribed antibiotics for the lump on Hall-Bey's foot, and referred Hall-Bey for a consultation with a podiatrist. Hall-Bey was seen on a regular basis by nursing staff and physicians, his specific complaints were addressed, his blood pressure and blood sugar levels were checked regularly, and ointments and medications were prescribed as warranted. The totality of Hall-Bey's care for his diabetic foot condition was constitutionally sufficient. Under these circumstances, the fact that he was not allowed to receive a particular pair of tennis shoes ordered from an outside vendor did not constitute deliberate indifference to his serious medical needs. Dr. Jaffri is entitled to summary judgment.

It is well-settled that a prisoner in a § 1983 case may not recover damages from an official solely because of his or her supervisory position under the theory of *respondeat superior*. *Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996). In order to be liable for damages, an individual must have personally participated in the alleged constitutional deprivation. *Zimmerman v. Tribble,* 226 F.3d 568, 574 (7th Cir. 2000); *see also Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001) (to be liable for the deprivation of a constitutional right, an individual must personally participate in the deprivation or must direct the conduct or have knowledge of and consent to the conduct).

Hall-Bey argues that defendants Commissioner Ridley-Turner, Medical Director Dean Rieger, and Assistant Superintendent Mulroony personally participated in the denial of his shoes because they were each aware of the situation. Commissioner Ridley-Turner referred complaints received by her department to Medical Director Dean Rieger. Mr. Rieger responded to the letters sent to the DOC.  Mr. Mulroony responded to Hall-Bey's grievances about the shoes. The fact that these defendants were involved with the multi-step grievance process or in drafting responses to letters written by people on Hall-Bey's behalf does not mean that they had personal responsibility for the decisions or that they were made at their direction. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). If an official, who is not otherwise responsible for allegedly unconstitutional conditions or actions, could be held liable upon being notified by the plaintiff, then a plaintiff could choose to bring any and all officials within the scope of liability simply by writing a series of letters or grievances. To allow liability to be based upon "such a broad theory. . . [would be] inconsistent with the personal responsibility requirement for assessing damages against public officials in a section 1983 action."  *Crowder v. Lash*, 687 F.2d 996, 1006 (7th Cir. 1982). Hall-Bey has shown no causal link between Ridley-Turner, Rieger, and Mulroony and the medical care Hall-Bey has or has not received. These defendants are thus entitled to summary judgment as to Hall-Bey's claims for damages.

## IV.  Conclusion

Hall-Bey has not identified triable issues of fact in support of the claims asserted in his complaint. Judgment as a matter of law is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). That is the case here. Accordingly, the defendants' motions for summary judgment must be **granted**.

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date:  07/14/2006

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana